No. 2566.

BUD McADAMS *v.* THE STATE.

1. CONTINUANCE—NEW TRIAL.—Sub-division 6 of article 560 of the Code of Criminal Procedure provides that though a continuance shall not be granted as a matter of right, still, if the application therefor be overruled and the defendant be convicted, a new trial should be granted, if it appears upon the trial that the evidence of the absent witnesses was material, and that the facts set forth in the application were probably true.

2. SAME.—The rule which should govern the action of the trial court in passing, first, upon an application for a continuance, and subsequently upon a motion for new trial, has heretofore been stated by this court as follows: "If there is such conflict between the inculpatory facts and those set forth in the application as to render it improbable that the facts stated in the application are material and probably true, the continuance should be refused; and hence, a new trial based thereupon should also be refused. There must, however, not only be such a conflict, but the inculpatory facts must be so strong and convincing as to render the truth of the facts set forth in the application improbable." See the

opinion for the substance of evidence set forth in an application for a continuance, which, the continuance being refused, demanded of the trial court, in view of the evidence on the trial, the award of a new trial.

3. SAME—CUMULATIVE FACTS.—An accused, resting his demand for a new trial upon disputed facts, is not entitled to a new trial in order to produce testimony that is cumulative of his evidence on the trial, but the doctrine of cumulative facts does not apply to applications for continuance. But note that the facts set out in the application for continuance in this case are not merely cumulative.

APPEAL from the District Court of Shelby   Tried below before the Hon. J. G. Hazlewood.

The indictment in this case charged the appellant, jointly with John Riden, Pedly Riden, James Riden, Henry Chumley, Henry Beckett, Will Booth and Wash Flournoy, with the rape of Minerva Horton in Shelby county, Texas, on the twentieth day of July, 1886. A severance being granted upon the application of the defendants, the accused was placed upon trial, resulting in his conviction, and the assessment against him of a term of thirty-five years in the penitentiary.

Pink McCollister was the first witness for the State. He testified that he was acquainted with defendant and with C. H. Horton, and his wife Minerva Horton, the alleged injured party. The witness was in the town of Centre, Shelby county, on the evening of Saturday, July 20, 1886. The outrage of Mrs. Horton was said to have been perpetrated on the night of that day. Between three and four o'clock on that evening the witness saw the defendant and the three Ridens, John, Pedly and James, together in that town. They were then between the court house and the store of Hicks & Bro. The parties named were standing off to themselves and appeared to be engaged in a conversation. Witness heard John Riden say that they were going out to Parson Horton's that night to have some fun. Witness then asked Will Booth if he was going with them, and he said that he was not, and the witness thereupon cautioned said Booth not to go. Witness was not more than five or six steps distant from the defendant and the Ridens when he heard John Riden make the remark stated. The witness, on the next morning, heard of the outrage perpetrated upon Mrs. Horton.

On his cross examination, the witness stated that he was brought to court by some one, but was not under process to appear as a witness. The witness first told Henry Chumley's wife of the statement he heard John Riden make on the evening

of but before the alleged offense. The witness was passing within three or four feet of the Ridens and defendant when he heard John Riden's remark about going out to Parson Horton's that night to have some fun. He remembered that a wagon load of watermelons, apparently, but not to the knowledge of witness, in charge of Calvin Hammer, who was standing near it, was standing on the public square, a short distance from where the Ridens and defendant were when John Riden made the remark. It may have rained on that day, but witness did not remember that it did. The witness had been in town all day, doing nothing of particular importance. After he heard the remark of John Riden, and had seen Ben Bullard, he went home, meeting several people on the road. He could remember none of them. It was on Sunday morning after he had heard of the rape on the night before, that he repeated John Riden's remark to the wife of Henry Chumley. He did not remember that he had ever told anybody else about John Riden's remark, but he had talked to the district attorney about the case. He had never told H. B. Short that he knew nothing about the case, nor did Short ever ask witness what he knew, and what he would testify on this trial, nor had witness ever talked to any of the defendants about what his testimony on this trial would be. He did ask Short who the witnesses against Chumley were. The witness was in the court room but once during the trial of John and Pedly Riden. He came to town as a witness in John Parker's case.

At the time that the witness heard John Riden's remark, Will Booth was standing off at some distance, talking to a white man about the election. Witness took Booth off a short distance and advised him not to go with the boys to Horton's, as their fun might prove serious and cost trouble. Witness did not then know that the boys intended doing anything wrong. Will Booth, Henry Chumley, John, James and Pedly Riden and the defendant came to town together from towards Riggs's place. Witness did not tell H. B. Short, in the presence of his son, that when he saw defendant and the Ridens, they were standing near the wagon, eating water melons, and that any one could have heard their conversation. The witness did not tell the district attorney what he knew about this case until the said district attorney sent for him. He did not know how the district attorney learned that he knew anything about it. Mr. Hammer was treating a crowd of boys to water melons at the wagon at

the time the witness overheard John Riden's remark. A day or two prior to this trial, Wash Flournoy, who was under indict-ment, asked witness if he told Mary Chumley "what the boys were going to do." Witness thought that he also talked to Nelse Stanley about the case.

Wash Flournoy was the next witness for the State. He tes-tified that early on the morning of the Saturday of the alleged rape, Henry Chumley was at his house, and borrowed his pistol. Early on that night defendant, Jim Riden, Henry Becket and Henry Chumley came to witness's house and said that they were going to Horton's to have some fun. Henry Chumley took the witness's pistol with him. The witness got his pistol on the next day from under a fallen log near Mr. Carnahan's house. Chumley told him where he would find it. Witness was in Centre on that Saturday afternoon, and saw defendant, the Ridens and Will Booth, standing together near Sanders's store. They appeared to be engaged in a conversation which witness could not hear.

Cross examined, witness said that he left town, going home about sun down. Jim Riden came to witness's house early on that night, but witness could not now remember whether or not he ate supper with witness. The said Riden came to witness's house from the house of Alice Smith, who lived on Mr. Holman's place, south from witness. It was late in the evening on the said Saturday when witness went to town. Jim Riden was in town when witness got there. He did not know when Jim Riden left town. He only knew from what Jim Riden said that he came to witness's house from Alice Smith's house. Booth and the defendant were the next two par-ties to reach witness's house on that night. Henry Becket, who came from towards Centre, was the next to arrive, and Henry Chumley came a short time later. He said that he came from home, and he was riding Adeline McAdams's horse. Mat Booth was also at witness's house. The parties named, except Mat Booth, remained at witness's house but a short time, and left. Jim Riden did not mention Horton's name before the others ar-rived, nor until the parties started off, which was between nine and ten o'clock. Witness did not know who made the proposi-tion to leave. . Some one of them said they were going to Hor-ton's to have some fun. Witness did not remember that he said anything in reply, nor did he remember that, after they left, he said anything to Mat Booth about their going to Horton's. The

party, on leaving, went towards Centre, and witness did not see them again on that night. When witness met Jim Riden, in town, on that evening, he told witness that they were going to Horton's on that night. Defendant, Jim Riden and Henry Chumley came back to witness's house at a late hour, on that night, awakened witness, and told him to make room for them on his pallet. When Jim Riden told witness, in town, that they were going to Horton's that night to have some fun, he mentioned the names of Henry Chumley, John and Pedly Riden and the defendant as the parties who were going with him.

Minerva Horton was the next witness for the State. She testified that she was the wife of C. H. Horton, and, in July, 1886, lived with her husband on the place of Mr. Ed Hicks, in Shelby county, Texas, about two miles from the town of Centre. She was the person upon whom the outrage, charged in this case, was committed. Between eleven and twelve o'clock on the night alleged in the indictment, the defendant, John Riden, Pedly Riden and Jim Riden reached the witness's house, and from the outside called to know who lived there. The witness's husband got out of bed to go to the door. The witness cautioned him not to open the door, and he went to the window, opened it, and told the parties that the house was occupied by Parson Horton. They replied that he was the man they were looking for; that they had come there to kill him and intended to do it, and that he must come out of the house. Witness's husband then ran to the back door, and cried "murder" three times. He then ran back from the door and got under the bed. Some of the parties then pushed open the front door, and witness ran out through the back door. Outside she encountered Pedly Riden, who made her go back into the house. The parties then ordered witness to come out of the house and submit herself to their several carnal passions. Witness declared that she would do no such thing, when they replied that they would "take it." One of the parties then asked for the witness's husband, and she, thinking they would leave, told them that her husband had escaped. One of them replied that the witness was a liar, and ordered her to strike a light. She replied that she had no matches. John Riden then said that possibly Horton was under the house, and that he would light a pine torch. While he was getting the pine, Horton ran out of the house and escaped, followed by a shot from Pedly Riden's pistol. The three Ridens and defendant were standing together at the door, defendant being armed with

a gun. After discharging his pistol at the fleeing Horton, Pedly Riden turned to defendant and exclaimed: "Give me the gun; head him; head him, boys!" The four men named then pursued Horton a short distance and returned. When they got back, witness pointed up the road, and said to them: "Yonder comes some men from Centre." The parties named, defendant and the three Ridens, then ran to the smoke house and got behind it.

They remained behind the smoke house but a short time, when they entered the house, defendant being in advance. As soon as he crossed the threshold, the defendant covered the witness with his gun, and said to her: "Lie down! we are going to have it." Witness replied beseechingly: "For God's sake don't make me do that; I do not want to do it; I have not been raised in that way." Pedly Riden then said to witness. "Flop over on that bed, God d——n you; we will raise you to-night! Get down there and open up them legs!" The defendant, who still had the witness covered with the gun, said to her: "Get down there and let them have it, or I will blow your brains out!" Pedly Riden then seized witness, forced her to the bed, laid her down, got on top of her, and had forcible connection with her. When he got through, defendant got on witness and had forcible connection with her. When he got through, Jim Riden had forcible connection with witness, and when he got through, John Riden got on witness and had forcible connection with her. When he got through, Pedly Riden got on witness again, and ravished her, and when he got through, the defendant did the same thing a second time. The defendant and the three Ridens subjected the witness to their passions at the muzzle of the defendant's gun, and by threats to kill the witness if she did not yield. The witness knew the parties well, and knew them when they raped her. The defendant, Pedly, John and Jim Riden, were the men who had carnal knowledge of witness, as above stated. As soon as witness was released by the parties, she went to the house of Jane Myrick, and told her the circumstances of the outrage. She did not see her husband again until the next day, when she reported the facts to him.

The rigid cross examination to which this witness was subjected elicited but little of importance, in addition to her statements on direct examination. She stated, however, that when she went out of the house and was met and sent back by Pedly Riden, he, Pedly, asked her if she knew any of the parties. Al-

though she did positively know all of the parties, but being in fear of her life, she replied that she did not, when Pedly said that if he thought she did know either one of them he would kill her.  Witness had been married about a year at the time of the outrage, and was childless, but was about four months advanced in pregnancy, and had miscarried during the previous fall. Witness had a hemorrhage of the womb a few days before the assault, the result of a fall.  When the witness was released by the parties she caught up her house kitten and said something to it, when one of the parties, then in the act of leaving, turned to witness and said:  "If you don't hush we will give you another round."  They then left, going towards the Phillips place, and witness went to Jane Myrick's.  Soon after daylight witness and Jane Myrick went to witness's house, and saw Horton returning home.  She found her household things very much as she left them.  The sheet on the bed was soiled.  The sheet was put on the bed, clean, on Friday.  Witness remained but a short time in her house, and went to the house of Joana Roberson. She saw the tracks of four men in the road, which said tracks led first from the direction of Centre towards witness's house, and then from witness's house back towards town.

Jane Myrick testified, for the State, in substance, that Minerva Horton came to her house about midnight on the night of the alleged outrage.  She was apparently distressed, and told witness that defendant and John, Jim and Pedly Riden had outraged her.  Witness, who lived about a quarter of a mile from Horton's house, did not hear any hallooing or shooting at Horton's house on that night.

Joana Roberson testified, for the State, that she lived about half a mile from Horton's house.  She heard shouting and the report of a pistol on the night of the alleged outrage.  A short while before the shouting and the shooting, the witness saw four colored men, whom she did not recognize, pass her house, going in the direction of Horton's.

W. T. Riggs testified, for the State, that he, as justice, presided at the examining trial of the defendants in this case, and remembered that a sheet and a woman's gown were exhibited on that trial; both articles were much soiled.  The corrupt matter resembled the flow from the nose of a person with a bad cold, and witness supposed it was semen.

The State rested.

Amos Hooper was the first witness for the defense.  He tes-

tified, in substance, that he and John Riden were brothers-in-law. He lived near Buena Vista. He remembered distinctly that John Riden and his wife, Mandy, and Pedly Riden, arrived at his house on the night of Friday, the night before the alleged outrage. They came in on an ox wagon to get John Riden's bedding and take it to the house of his father, Peter Riden, near Centre. They left witness's house about eight o'clock on Saturday morning to go to Peter Riden's, near Centre.

Mandy Riden, the wife of John Riden, testified, for the defense, substantially as Hooper did, and, in addition, that she, John and Pedly Riden, on their return from Hooper's, reached Centre about sun down on the Saturday evening of the alleged rape. John and Pedly Riden got out of the ox wagon in Centre, and George Riden got in and drove it to old man Pete Riden's house. John Riden overtook the wagon before it got home, ate supper with the witness, remained with her until bed time, then went to bed with her, and did not leave his bed on that, the night of the alleged outrage.

B. M. Irish testified, for the defense, that he was a merchant and did business in Centre. He went out on the Buena Vista road, as well as he could recollect, on the evening of Saturday, July 20 (the date of the alleged offense), and, at a point between three and four miles, met John Riden in an ox wagon traveling towards Centre. He was not positive enough as to time to swear absolutely that it was on the Saturday of the rape that he met John Riden, but that was his clearest impression. Witness was a Mason, and if there was a meeting of the Masons in the lodge in Centre on that night, and witness was present, then the evening on which witness met John Riden was not the Saturday evening of the alleged rape.

Doctor J. W. Rogers was the next witness for the defense. He testified that he was called to treat Minerva Horton a short time before the alleged outrage. He found her two or three months advanced in pregnancy, with threatened abortion. He thereupon gave her medicine to prevent abortion, and directed her to use it until the fifth month of pregnancy was passed. A woman's usual period of gestation was nine calendar months, but the first child usually made its appearance two weeks earlier. If a woman be raped six times in immediate succession, by means of threats and the display of fire arms, and resists throughout each process, she will emerge from her severe trial very much fatigued, exhausted and mentally excited. It might

be possible, but hardly probable, that she would feel like moving about the next day. Witness would not say that such an experience would necessarily disable her from moving about.

On cross examination, Minerva Horton's condition prior to and at the time of the alleged rape was stated to the witness hypothetically, and he declared that under such conditions abortion would not necessarily result from her treatment by the men. She had been taking medicine with which the witness had been very successful in the prevention of abortion. He carried one woman to her full period who had always aborted before, her abortions numbering seven. Medical authority records that in one instance the womb of a woman was opened for the purpose of removing an ovarian tumor, when it was found to contain a child. The womb was sewed up and the woman went her full period. Another record shows that a woman, whose womb was gored by an ox, carried her child the full period after the womb was sewed up. Medical records report many cases of full period children being born after extreme injury to the mother's womb. In other instances the slightest causes produced abortion. It depends largely upon the habits and temperament of the woman, whether given causes, great or small, will produce abortion. Recently discharged semen resembles the white of an egg, but becomes yellowish from exposure, and assumes the appearance of a discharge from the nose on a handkerchief. A woman who has once aborted is very likely to abort again at the same stage of pregnancy.

Doctor F. W. Fambro testified, for the defense, that he visited Minerva Horton on the sixth of June, 1886, and found her suffering from a hemorrhage of the womb. He treated her for threatened abortion.

Fannie Oats testified, for the defense, that she saw Minerva Horton in Centre on the Monday after the alleged rape, on which occasion Minerva told her that she did not know either John, Jim or Pedly Riden until they were pointed out to her by Joana Roberson. The witness was a sister of the Riden boys.

At this point, evidently for the purpose of impeachment, the defense recalled Minerva Horton, who denied the statements of the witness Fannie Oats, and declared that she was not in Centre on the Monday after the rape, and that, on the day during the succeeding week when she was in Centre, she saw the said Fannie at a distance but did not speak to her.

For the same evident purpose, the defense recalled Jane Myrick,

who denied that she ever told one Charlotte Covington that Minerva came to her house on the evening of and after the rape, and told her that a crowd came to her house on that night and ran Horton off, but that she said nothing on that night about being raped, but told her the next morning.

Charlotte Covington testified, for the defense, that, some time after the alleged rape, she had a conversation with Jane Myrick, in which she expressed her belief to the effect that there was no truth in the report of the rape. Jane then told witness that Minerva came to her house on the night of, and after the rape, and told her that a crowd came to her house, and ran Horton off, and that she then fled; that Minerva said nothing on that night about being raped, but on the next morning told her that "all the boys had to do with her."

Henry Becket was the next witness for the defense. He testified that he worked on Bud Garrett's place on the Saturday of the alleged rape, and left his work late in the evening, reaching Centre about thirty minutes before sun down. He remained in town until dark. He saw Pedly Riden, defendant, Henry Chumley and Will Booth, in town. From town witness went to the house of Sylla Becket. Thence, after remaining a time, he went to Wash Flourney's house, where he found Will and Mat Booth and Chumley. Jim Riden and defendant reached Flourney's house at different times, after witness arrived. After remaining at Flourney's for a while, witness, Chumley, Will Booth, Jim Riden and defendant left, and went, over several routes described by witness, to Horton's house. No others than the persons last named went to Horton's. Witness was certain that John and Pedly Riden were not in the crowd. Some one of the crowd asked in a loud voice: "Who lives here?" The answer was: "Parson Horton lives here." Something else, which witness did not understand, was said, when Parson Horton rushed out at the front door and fled, pursued by some of the boys, who, after following a short distance, returned. Minerva then said: "Yonder comes some white men from Centre," and the boys fled a short distance. Witness and Chumley got behind an out house, where they were presently joined by defendant, Jim Riden and Will Booth. All of them then left Horton's, and went off. No rape or attempt to rape was perpetrated upon Minerva Horton on that night.

On his cross examination, this witness said that no one followed Horton when he fled from his house, although on his

direct examination he had said that some of the boys followed
him. "The boys" told witness in town that they intended to go
to Horton's that night to run him off, "just for fun." Witness
did not go to Flournoy's to meet the boys, but went there to see
Flournoy's folks, and "running up" with the boys, he went with
them to Horton's to have some fun. The witness denied that he
ever told Mr. Lucky that he did not go with the boys to Horton's.
He denied that he went to Stephenson's house on that night, and
declared that Will Booth did not leave the crowd from the time
they left Flournoy's until after they left Horton's. He did not
go by Stephenson's. In short, the crowd did not separate, fur-
ther than a few yards, after leaving Horton's. This witness
located himself and his companions in Horton's yard that night,
but denied that any of them went into the house. Chumley did
not tell the witness in town what kind of fun the boys expected
to have at Horton's. He admitted that a pistol was fired at
Horton's house, but declared that it was fired before Horton ran
out of the house. In fact, it was fired before witness and Henry
Chumley reached the house. The three other boys were about
seventy yards ahead of witness and Chumley before reaching the
house. Witness did not see Horton or his wife that night, but
knew from her voice that Mrs. Horton at one time was out in the
yard. Some one of the boys took a gun to Horton's on that
night. During the trip it was handled by several or all of the
boys. The witness admitted that he had denied to his mother
that he was at Horton's house on that night. That was a lie,
and witness did not think there was any harm in lying when in
a hurry. He didn't have time to tell his mother the truth when
she questioned him about the matter. Moreover he didn't want
her nor any one else to know that he had been there. "People
will talk."

Albert Riden, and other witnesses who located themselves at
old man Pete Riden's house on the Saturday night after the out-
rage, located John Riden at old man Peter's throughout the
night, and George Riden testified that Pedly Riden came to Pete
Riden's about dark, and did not leave the house again on that
night. Albert Riden denied that he ever told Beverly or Rody
Gibbs that he would readily swear to a lie to get any of his fam-
ily or color out of trouble.

Jane Myrick was again recalled by the defense, and after re-
capitulating her testimony with regard to her conversation with
Charlotte Covington, denied that she ever told Att Booth [a dif-

ferent person than Matt Booth] that Minerva Horton said nothing to her about being raped, on the night after the outrage was committed. On the contrary, she told Att Booth that Minerva did tell her that she was outraged by the defendant and the Ridens, and that thereupon Att Booth said that he did not believe the boys raped Minerva, and pleaded with witness to testify that Minerva did not, on that night, tell her anything about being outraged.

Att Booth testified, for the defense, that he had two conversations with Jane Myrick within about six weeks after the alleged outrage. On each of these occasions Jane Myrick told witness that Minerva came to her house about midnight on the Saturday night of the alleged outrage, and told her that the boys came to her house and ran Horton off, but told her nothing about being raped until the next morning. Witness was not related to Will Booth. Matt Booth did not live at witness's house.

J. S. Stephenson testified, for the defense, that Will Booth came to his house about dark on the night of the alleged outrage, remained but a short time, and left, going towards town. The witness volunteered to prosecute this case in the justice's court.

On cross examination, he said that he knew Att Booth's reputation for truth and veracity, and that it was bad.

Chandler and Parker testified that Att Booth's reputation for truth and veracity was good. Chandler admitted that Att Booth once told him a lie about cutting some oats.

Henry Chumley testified, for the defense, substantially as did witness Becket. He declared that, although John and Pedly Riden were parties to the agreement to go to Horton's, they did not go. The parties who went were witness, defendant, Jim Riden, Will Booth and Becket. They went solely to "devil" Horton, scare him and run him off from his home. No outrage on Minerva was agreed upon, and none was committed. Witness got a pistol at Wash Flournoy's on Saturday morning, and, after keeping it in his possession about fifteen minutes, he put it under a log near Carnahan's house. He denied that he told Mr. Luckey that any of the boys went into Horton's house. Witness did not hear a pistol fired on that night.

J. J. Ramey, who lived on the road between Centre and Horton's house, and McKnight, who was in company with Ramey on that night, testified, for the defense, that, returning home from the Masonic lodge on the night of the alleged outrage, they

saw five men near Ramey's place, one of whom was Henry Chumley. It was then about ten o'clock.

The defense rested.

G. W. Holman, R. K. Gibbs and Beverly Gibbs testified, for the State, in rebuttal, that they knew the reputation of Albert and George Riden for truth and veracity, and that it was infamous.

County Attorney J. A. Luckey testified, for the State, that he had a conversation with Henry Chumley, in jail, on the day after his arrest. Witness warned him against making any statements about the matter. Chumley said that he, defendant, Jim Riden, Booth and Becket went to Horton's house on that night, and that he wanted to plead guilty to a disturbance of the peace. He said that he did not, but the other boys did, go into the house, but he did not think they committed rape on Minerva Horton.

Doctor Furlow's testimony is stated in the opinion of the court.

Doctor Duke, testifying upon the same hypothetical case, said that abortion would not inevitably follow the circumstances detailed in this case, but that the woman, having aborted before, and being, at the time of the rape by six different and successive processes, three months advanced in pregnancy, she would almost necessarily abort.

Henry Becket, recalled by the defense, stated that four of the crowd went to Horton's by Mr. J. J. Ramey's place, and one went another route across a field. He denied that, on his examination in chief, he testified that he did not leave the crowd on that night. He did say that sometimes he was behind the crowd. It was seventy yards across the field referred to by witness. Witness was the man who went across the field.

C. W. Hicks testified, for the State, that Minerva Horton's reputation for truth and veracity was good.

W. T. Riggs testified, for the State, that he was present at the meeting of the Masonic lodge in Centre, on the night of the alleged outrage, and knew that B. M. Irish attended the lodge on that night.

Reuben Addison testified for the State, in rebuttal, that he was present and heard a conversation between Jane Myrick and Att Booth about the rape of Minerva Horton. Att Booth requested Jane to say that Minerva did not say anything to her about being raped until the morning after the alleged outrage. Jane declined to do so, but said that Minerva did, when she reached her house on that night, say that the defendant and the three Ridens had raped her.

By witnesses introduced respectively by the State and defense, Att Booth's reputation for truth and veracity was alternately pronounced bad and good. Charlotte Covington's reputation for truth, as far as it was inquired into, was pronounced good, and that of Pink McCollister bad.

The motion for new trial raised the questions discussed in the opinion, and recites that, if the new trial was granted, Will Booth would be presented as a witness and would testify, in substance, that he was one of the five parties who went to Horton's house as stated by the witnesses Becket and Chumley; that they went to said house for no other unlawful purpose than to have sport with Horton by frightening him and running him from home, and that no rape was committed, or attempted upon Minerva Horton on that night.

On their separate trials, and substantially on the same evidence as that above detailed, James and Pedly Riden were also convicted of rape. They both appealed, and their convictions were set aside by this court for the same reasons as those assigned in the opinion in the present case. The accused, as it appears, were all colored men, and it is inferable that Minerva Horton was also colored.

*D. M. Short & Son,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

Hurt, Judge. On the eleventh day of November, 1886, the grand jury of Shelby county indicted the following named persons for rape upon Minerva Horton, viz: John Riden, Pedly Riden, James Riden, Bud McAdams, Henry Chumley, Henry Becket, Will Booth and Wash Flournoy. On May 19, 1887, the case was called for trial, whereupon counsel for the State entered nolle prosequi as to Will Booth, Henry Becket and Henry Chumley, and the defendant had these parties recognized as witnesses in his behalf. On May 20, 1887, the trial in fact began. On the morning of the next day, appellant for the first time discovered that Will Booth had absented himself. He had an attachment promptly issued for the witness, returnable *instanter*. The attachment was returned not executed, because not found in the county. Appellant then moved to withdraw his announcement of ready for trial, setting forth the above facts, as well as what he expected to prove by Booth, in his application for continuance.

These motions were overruled, and a bill of exceptions was taken thereto. Being convicted, appellant, among other things, urged this in his motion for new trial.

Minerva Horton, the prosecutrix, was the only witness to the rape. She swears positively to facts which, if true, make a plain case of rape. Now, the indictment alleges that Booth, Becket, Chumley and Flournoy were guilty also of this offense, the charge against them, however, being dismissed. Minerva Horton does not implicate either of these parties, she swearing that the rape was committed by John Riden, Pedly Riden, Jim Riden and the defendant.

In his application to withdraw the announcement and continue the case, appellant swears that he expects to prove certain facts by Booth, who, it is alleged, was present at Horton's at the time of the supposed rape. If true, evidently these facts are material. The witnesses, Chumley for the defendant, and Flournoy for the State, corroborate the facts proposed to be established by Will Booth. These two witnesses agree as far as they go. They agree that the party started together from Flournoy's house, and as to the persons accompanying the party, to wit: Chumley, Jim Riden, Becket and defendant. Appellant expected to prove by Will Booth that John and Pedly Riden were not in the crowd. This expected proof is rendered probably true because Flournoy and Chumley swore they were not at Flournoy's house, the point from which the party started, and Chumley swore that they were not at Horton's with the persons who were there, he being one of the party.

Now, it must be borne in mind that the prosecutrix swears positively that John and Pedly Riden, with McAdams and Jim Riden, outraged her. By other witnesses very cogent facts are established, tending to show that John and Pedly Riden were not at Horton's on the night of the alleged rape. The testimony of Will Booth being thus material, not only for the purpose of showing that John and Pedly Riden were not at Horton's, but to show that no rape was committed by any person, we must inquire into its probable truth.

Having referred above to some matters strongly tending to its corroboration, we briefly notice the statute bearing upon this subject. Applications for continuance are not granted as matters of right. If the application be overruled, and the defendant be convicted, a new trial should be granted, if it appears upon the trial that the evidence of the absent witnesses or witness was ma-

terial, and that the facts set forth in the application are probably true.    (Code Crim. Proc.; art. 560, subdiv. 6.)    Must the evidence on the trial affirmately show that the facts set forth in the application are probably true?    If material and probably true, the case should not be continued, unless the facts are exculpatory or tend to discredit or explain the inculpatory facts.    We therefore assert that, if the evidence adduced upon the trial shows the materiality and probable truth of the facts set forth in the application, the accused should not, in such case, be convicted. For, evidence tending to show the materiality and probable truth of the exculpatory facts is not sufficient to convict, of course.    And if such a construction be given the statute, a new trial neither would nor should ever be granted, because of the overruling of the application for continuance, except in cases in which the evidence is insufficient to warrant a conviction—a case in which a new trial should be granted for want of sufficient evidence.    These are the views of the writer alone.

We do not so construe the statute.    If there is such a conflict between the inculpatory facts and those set forth in the application as to render it improbable that the facts stated in the application are material and probably true, the continuance should be refused, and hence a new trial based thereupon should also be refused.    There must, however, not only be such a conflict, but the inculpatory facts must be so strong and convincing as to render the truth of the facts set forth in the application improbable.    This is the rule announced in Hollis v. The State, 9 Texas Court of Appeals, 643.

We think it certain that appellant, Jim Riden, Will Booth, Henry Chumley and Henry Becket were at Horton's at the time prosecutrix says she was outraged.    But that they were there for the purpose of rape is only shown by the testimony of the prosecutrix.    This case presents some remarkable features— features of fiendish brutality which are almost without parallel; if it be true that the outrage was committed as testified by the prosecutrix.    According to her testimony, the physical act of raping was perpetrated six times in succession so continuous that there was not a moment of intermission between the separate acts, these acts being participated in by four different persons, to wit:    Bud McAdams, John Riden, Pedly Riden and Jim Riden.

Doctor Furlow, an expert witness, testified that in the case of a woman such as this, she being twenty-eight years old, one year

married, and at the end of the third or fourth month of first
pregnancy aborted, at the end of one year pregnant again and
again threatened with abortion, and some three or four months
advanced in pregnancy, that a woman of such antecedents,
assaulted by four men with guns in hand and raped six times by
them, would in ninety-nine cases out of a hundred abort again.
This witness, with other physicians, states that under the above
circumstances, abortion would not necessarily follow.    Now,
applying the rule above stated, we do not think that the crimi-
nating facts are of such a character as to render the truth of the
facts set forth in the application for continuance improbable.    It
is true that appellant, with others, was at Horton's for an illegal
purpose.    Appellant insists that they were there for the purpose
of having some sport by frightening and running Horton from
his home, and that this was the only purpose.    The State con-
tends that this was for the further purpose of ravishing his wife,
Minerva Horton.    The testimony of Minerva Horton supports
the theory; that of Wash Flournoy, Henry Chumley and the
facts set forth in the application for continuance, tend to support
the theory of appellant.    There is a direct conflict between
Chumley and the prosecutrix, the former corroborating the facts
stated in the application.

The Assistant Attorney General urges, in support of the action
of the court below, that Flournoy, Chumley and Booth rest
under suspicion because they may be accomplices.    As to Chum-
ley and Booth, the State's theory, based upon the evidence of the
prosecutrix, is that they were not at Horton's at all.    The extent
of Flournoy's connection is that he was informed of the purpose
and intention of the party to go to Horton's, and that he fur-
nished a pistol.    There is no evidence that he knew of an
intended rape.

The Assistant Attorney General, while conceding the material-
ity and probable truth of the facts set forth in the application,
insists that the facts expected to be proved are cumulative, etc.
In this there is a mistake, for by examination and comparison, it
will be seen that Chumley swore that he left at a certain time
with some of the party, leaving Booth with others. Booth covers
this hiatus by showing that he was with the parties left by
Chumley, and that there was no rape committed by his compan-
ions.    We do not think that the doctrine of cumulative facts
applies to motions for continuance, especially to a first applica-

tion. This is a well known doctrine when considering an application for new trial upon merely disputed facts.

We conclude that the continuance should have been granted, or a new trial awarded. The judgment is reversed and the cause remanded.

*Reversed and remanded.*